REID, Judge.
This is an expropriation suit brought by the State of Louisiana, Department of Highways, against Walter Eichelberger, seeking to expropriate all of Lot 11, Square 206 or 1, Suburb Young, measuring 60 feet front on the North side of America Street between parallel lines. The easterly line measuring 111.SO feet in length and the westerly line measuring 111.53 feet in length. There was a two story frame house located on the property with three apartment units downstairs which were *94 rented and one apartment unit upstairs. The upstairs apartment was used by the owner for his personal use.
The plaintiff secured a judgment of expropriation and deposited in the registry of the court the sum of $18,000.00 as its estimate of just compensation. The defendant filed an answer alleging that the just compensation should be in the amount of $30,000.00.
The trial court, in a written opinion, rendered judgment fixing the market value of the subject property at the sum of $23,-140.00 from which subtracted the deposit of $18,000.00 gave the defendant additional just compensation in the amount of $5140.-00, together with interest at the rate of 5% per annum from July 12, 1960 until paid. The Judge awarded defendants’ two appraisers fees in the sum of $350.00 each, of which $250.00 was for preparation and $100.00 per diem was for testimony of said witnesses in this case.
By agreement of counsel these awards to the two appraisers were taxed as cost.
From this judgment the plaintiff prosecutes this appeal.
The trial judge, in his well considered written reasons for judgment found as follows:
“It is so well settled in this State as to need no citation of authority that the price to be paid by the State to the owner for his property when it is expropriated for public purposes is the market value of the property, or as near to the market value as it can be arrived at by competent, reasonable, and reliable appraisement. It is also an accepted principle that the market value is the price which would be agreed upon between the owner who is willing to sell and a purchaser who is willing and able to buy the same property in a private voluntary business transaction. It is likewise well settled that the most reliable method of determining the market value for expropriation purposes is recent private voluntary sales of properties with comparable characteristics as to location, size, construction, materials, age and use. When there is no sale of property meeting the test of such comparability which can be used as a safe guide then other methods of valuation of necessity must be relied upon. And in the event the subject property consists of land and improvements, as in this case, the total valuation to be determined must include both land and improvements as a unit.
“While it is preferable to rely upon prior sales of comparable properties consisting of land with improvements sold as units, if there is no sale of other property of sufficient comparable characteristics as to constitute a reliable guide and there is found to be sales of unimproved land very similar to the land on which defendant’s improvements are located then the value of the land can be determined by comparable sales and prices, and the value of the improvements arrived at separately by other acceptable and reliable methods, the total of the two to form a unit value.
“The defendant’s property is described as lot 11 of square 1 or 206, Suburb Young, according to the official map of the City of Baton Rouge. The lot measures 60 feet fronting on the north side of America Street by a depth of 111.5 feet. The improvements consist of a two-story frame dwelling, pavement, garage apartment and shrubbery located a half block east of East Boulevard, a four-lane boulevard with wide neutral ground separating the northbound and southbound traffic lanes.
“Kermit Williams and W. D. McCants testified as expert appraisers for the defendant. Both of these witnesses for the defendant are well known to me as competent, reliable, conservative realtors and residential construction developers in this city with many years of active experience in these lines.
“Mr. Williams could find no recent sales of improved property in the neighborhood of sufficient comparability on which to base a reliable valuation of the whole of subject *95 property. He did use several sales of vacant land which easily fixed the value of defendant’s lot at $110.00 per front foot or a total of $6600.00 for the lot. He then made a detailed analysis of defendant’s improvements and found that the buildings could be reproduced at $7.50 per square foot for the living portions, (4195) square feet, Tr. 12), $4.60 per square foot for the porches, (393) square feet, Tr. 12) and $2.50 per square foot for the garage apartment (540) square feet, Tr. 48). He placed a value of $1250.00 for the hard surface parking area and driveway, trees, shrubbery, etc., and says the total is $33,080.00, (my total on above is $35,870.00), less 50 per cent depreciation or a present market value of the improvements of $16,540.00 plus $6600.00 for the land, a net unit total of $23,140.00. In determining the market value of the improvements Mr. Williams in his customary, thorough consideration explained the kind and dimensions of the structural materials contained in' the dwelling and its state of preservation, maintenance and prospective use. The floor joists were 2 x 10 cypress, placed 16 inches on centers. The sills were 6x8 cypress, with subfloor, cypress exterior, interior walls plastered, composition roof and gutters in front. Part of the main dwelling was built about 1910 but it was renovated and upstairs added in 1923. The property was occupied for a number of years by the present owner’s parents and after their death when the defendant came into full ownership he converted the first floor into rental apartments and he and his own family have occupied the second floor as a family home until the taking by this plaintiff. All the witnesses certified to the excellent condition of the property as to maintenance and preservation and estimate that without this taking with continued proper maintenance it should be a good building when it is 100 years old. The large cypress structural timbers which it contains substantiate that estimate in the light of many of the fine old homes well known in Louisiana to-day which are already more than 100 years old.
“To corroborate this evaluation Mr. Williams capitalized the rental revenues from the property less the usual deductions for taxes, upkeep, etc., which calculation came out right at $22,000.00.
“Mr. Williams further explained that when there is no comparable recent sales in the neighborhood to be considered his methods are the well established procedure of all reliable and experienced realtors in Baton Rouge in establishing value of land and improvements which they plan to place on the market for owners. In fixing the depreciation of this property at 50 per cent he took into consideration all types of depreciation. Mr. Williams testified that favorable location of subject property is. one reason he assigned top value to the land because the location is actually better and more favorable than the comparables he used; that to go several blocks east or west on America Street, going south as far as Government Street and across it, the value of the land and improvements decreases; that the type of construction of the improvements of subject property is better; that it is not true (as counsel for plaintiff endeavored to show) that the homes in this area are dilapidated and fast being converted to rooms for rent and boarding houses.
“Mr. McCants for defendant found the subject property as a unit to have a market value of $25,000.00. By use of private sales of comparable land he appraised the land here at $7000.00 on both the front foot and square foot basis. On the subject of improvements this witness explained that there were some two-story dwellings in that neighborhood, but none of them had been sold at private sale and while he studied a number of sales there was not enough similarity, in any of them to permit even an approximate comparison to be made; that one’s imagination would have to be stretched to compare this property with properties which had been sold and the result would not be accurate. Mr, McCants first made an accurate calculation of the construction cost at $8.00 per square *96 foot for the main dwelling, $4.00 for the porches of that dwelling and $3.00 for the garage and garage apartment, the total of which he found to be $31,988.00. He estimated the remaining economic life to be SO years and after deducting 44 per cent for depreciation he appraised the present market value of the buildings to be $17,-913.00 plus $1485.00 for pavement, shrubbery, etc., plus the land, a total unit valuation of $26,398.00. Mr. McCants said that the income production less the customary deductions for possible vacancies, upkeep, insurance, taxes, etc., furnished a very good check. By that method he arrived at the unit evaluation of $24,587.00 and he balanced his appraisement out in the round figure of $25,000.00. He said he could have sold the property for that amount. He fortified Mr. Williams’ testimony that the property ‘had received excellent care over the years and was in excellent condition’ with satisfactory tenants in the rented portion, some of the tenants having been there 5 years.
“Mr. Cobb testified as an expert for plaintiff, Highway Department. He said he arrived at a value of $18,000.00 for the whole property by use of what he called comparable sales. At page 79 of the transcript he used the sale of Sanchez to Schorten, 541 America Street at a sale price at $11,500.00 and he adjusted that up to reconcile it with defendant’s property. The Sanchez dwelling contained 2376 square feet on a lot 48 x 64 as against 5038 square feet which is the size of subject property (more than twice as much) on a lot 60 x 111.5 feet. Tr. 11, 12, 48.
“At page 86, Mr. Cobb used a sale by Citizens Building and Loan Association to Simon of property containing 5100 square feet at 415 Europe Street for $20,000.00. (That property is about six blocks away from subject property and in my opinion is a much less desirable neighborhood.) The witness adjusted that figure down to fit $18,000.00. On plaintiff’s exhibit 8 it is noted that ‘Quality of Materials and Workmanship: Fair. Condition of Building: Fair’ All witnesses testified to the excellent materials and condition of subject property.
“At page 90, Mr. Cobb referred to a sale between Baton Rouge Building and Loan Association to a church for $15,750.00. He says the size is comparable except the subject property is larger. He adjusted that up. On plaintiff’s exhibit 10 it is noted that repairs to this building immediately after the sale were made for $2500.00. Evidently, the need of repairs must have been reflected in the low sale price. Such difference in size and condition destroys its comparability.
“At page 54, Mr. Cobb used the sale by Foote to Starring at 320 East Boulevard for $15,500.00. To my mind, from the outside appearances of the properties and from the descriptions given by the witnesses, this sale (plus the sum of about $9000.00 spent by the purchaser to repair it and put it in its present condition) is just about the only sale referred to by any of these witnesses that is worthy of any consideration whatever as a comparable. On his direct examination this witness said nothing about the necessary additional expenditure of $9000.00 made immediately after the purchase, though the witness knew about it. That information was brought out on cross examination at page 120. Apparently if the renovations had been made before the sale the purchase price would have been $24,-500.00 instead of $15,500.00 used by this witness in making his comparison.
“Mr. Cobb explained that in order to make his adjustments up or down he used some sort of table which gave him an adjustment factor to be applied against the property he used as comparables. Actually, with that sort of gadget one could take any property sold at any price and call it a comparable when in fact there is no comparability. Such a method is the rankest sort of arbitrary approximation. He admitted (Tr. 112) that his adjustments were arbitrary. I can recall no discussions in any decision where that type of appraisal *97 was relied on as indicative of true value. In addition to these things, Mr. Cobb does not give us any information as to the size and kind of structural timbers in any house except to say that they are made of wood. Mr. Williams gave details of sizes and types of materials and the manner of construction in his description of the subject property. (Tr. 11). This is indicative of its durability. The experts for the State do not so describe the buildings they use as comparables except to say they are wood frame. These things are of paramount importance in estimating the life of a building. To say that a building is made of wood is no information of value. There is a wide difference between sap pine and hard cypress of large dimensions.
“Mr. Cobb admits (Tr. 107) that the physical use life of the building may well be 50 to 60 years or even 70 years from now, properly maintained. He said (Tr. 115) the reproduction cost of subject improvements before depreciation would be $34,140.00 from which he deducted a 60 per cent depreciation. Mr. Williams fixes the reproduction cost at $33,080.00 (the correct figure is $34,620.00) to which he applied a depreciation of 50 per cent. The only difference is in the depreciation figure. Mr. Cobb said the reproduction cost of main building was $9.00 per square foot, whereas Mr. Williams used $7.50 and Mr. McCants $8.00, from which it safely can be said that the cost appraisal by Mr. Williams and Mc-Cants are conservative. I take it that the reason Mr. Cobb applies such a high depreciation percentage is that he attempts to distinguish between the physical life of the building and what he calls the economic life._ He says the economic life is much shorter than the physical life, because investors will not tie up their money over 8 to 12 years. All of which to my mind is no more than a chimerical appellation uttered for the sole purpose of repressive influence. A man buys a home for life. In addition to that this witness does not qualify as an expert in investments and he does not bring any investors to support his theoretical statements. He said he made inquiry here and there to determine that investors want their money back in 8 to 12 years, which classified such testimony as strictly hearsay and unproven and an unsupported conclusion worthy of no consideration whatever. He says that the property may last 100 years and be economically worn out in 20 years. The complete answer to that kind of badinage is that it is a safe presumption that people will be living in houses 100 years from now, unless Russia’s robot missiles destroy universal civilization.
“Mr. Rolston, the other expert for the plaintiff, testified (Tr. 142) that he valued the subject property at $17,000.00 (He signed the certificate attached to plaintiff’s petition appraising this property at $18,-000.00). At page 147 he says this subject property contains 4,000 square feet but both Mr. Williams and Mr. McCants said that the square footage measurement of the improvements was 5,038 square feet. Transcript 11, 12, 48. He used the same properties which he calls comparable as did Mr. Cobb and I have already discussed them above to show the glaring inequality and arbitrary ‘adjustments’ with respect to them.
“This witness says this neighborhood is in a state of disintegration brought about by encroachment of inharmonious groups. I presume he is referring to one isolated ownership by a negro near some property his family owns. Actually it is common knowledge that three or four blocks east on 12th and 13th Streets between North Boulevard and Government Street is an area of homes occupied entirely by negroes ever since Baton Rouge has been on the map. That colored section is no larger than it always has been. His statements (Tr. 158, 159) concerning the buying power of people moving into the neighborhood as being evidence of a degrading transition is without foundation or support. He does not name a single person who has moved into that neighborhood; nor does he assign any basis for such conclusion except the statement that he can just look at a *98 neighborhood and gain that information. In order to give any weight to that type of testimony it must be supported by detailed, positive, convincing proof, such as the names of people who have sold and moved out and of people who have moved in with definite proof of the differences in buying power, employment and earnings. Such testimony calls for names, deeds, dates, book and page, occupation and earnings and without such facts his testimony is the rankest kind of generalization. The evidence of Mr. Williams and Mr. McCants denies the situation which Mr. Rolston describes. I have the right to measure such evidence by my own knowledge of that area and I know that in that neighborhood there was before this taking substantial types of improvements, while not modern, but without exception the appearance was fresh and well kept.
“The cross examination of this witness was somewhat revealing. He did not know that the property just east of the subject property now belonging the Landry Estate was owned by a negro ten years ago. (Tr. 169) When asked specific questions on specific facts his answers are evasive. He would discourse at length on his favorite theme of the deteriorating transition, the exodus of owners and about tenant occupancy. Then from page 176 to 181 when asked if he knew that each of some 25 to 30 named homes in the neighborhood was owner occupied his answer to each one was, ‘No, sir.’
“In his brief counsel for plaintiff cites Orgel on Value Under Eminent Demand, which he says shows that the reproduction approach in market value determination is not acceptable. I know nothing about Mr. Orgel, but I quote the following from counsel’s quotation which, to my mind, if he is an authority, proves the use of reproduction cost in appraisements when proper allowance is made for depreciation, which defendant’s experts have done.
“ ‘ * * * Reproduction cost, with all its failings, has the appearance of objectivity and for this reason may seem to be a more practical test of value than one based on comparative sales of somewhat dissimilar properties or on a capitalisation of earning power. * * * ’ (Emphasis added).
“Defendant’s experts allowed adequate depreciation, considering the present condition of the building and the type of materials and construction in it.
“Every so-called comparable used by plaintiff’s experts were entirely dissimilar properties requiring the appraiser to make arbitrary adjustments which did not aid the Court in arriving at a true value of subject property.
“There is very little difference between the total values of defendant’s experts. In order to be fair about it I adopt the smaller of the two and fix the market value of defendant’s property at the time of taking at $23,140.00.”
We find no manifest error in the foregoing reasons for judgment of the trial judge.
The holding of the Supreme Court in State through Department of Highways v. Ragusa, 234 La. 51, 99 So.2d 20 is directly in point. The holding of this case is as follows:
“The various methods to appraise the value of the subject property have materially assisted us in determining the correctness of the trial judge’s findings, and the principle that findings of fact by the trial judge shall not be disturbed in the absence of manifest error is too well settled to warrant citation. * * t-
“We recognize the accepted rule that the opinions of qualified experts are of material aid and should be given weight and effect, particularly where, as in the instant case, these opinions appear to be well grounded from the standpoint of sincerity and logic.” *99 State through Department of Highways v. Ragusa, 234 La. 51, 99 So.2d 20.
For these reasons it is ordered that the judgment of the lower court be affirmed.
Affirmed.